**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ALEXANDER ("ALEC") AZIZ | |
| *Plaintiff*, | Case No.:  1:23-cv-9338 |
| v. | **COMPLAINT** |
| CHANEL, INC. | **JURY TRIAL DEMANDED** |
| *Defendant*. | |

Plaintiff, Alexander "Alec" Aziz, by and through his attorneys, The Ottinger Firm, P.C., hereby files this Complaint against Defendant Chanel, Inc. ("Chanel" or "Defendant"), to allege upon knowledge concerning his own experience, and upon information and belief as to all other matters, as follows:

## PRELIMINARY STATEMENT

1.     This case is another in a long line of cases chronicling the racist and xenophobic environment that permeates Chanel and fosters a toxic workplace where workers of color, queer individuals, and/or immigrants, are verbally violated and sexually harassed. Plaintiff Alec Aziz, a dedicated and hardworking former Boutique Facilitator at Chanel, endured an extremely hostile work environment. He was discriminated against, as well as verbally and sexually harassed, because of his race, national origin, and sexual orientation. As is typical of Chanel, Mr. Aziz's complaints, five in total, were repeatedly ignored.

2.     Chanel has a well-documented and notorious reputation for racism, religious discrimination, homophobia, xenophobia, and tolerance of sexual harassment. Chanel executives and creative partners deride marginalized people and foster a toxic work environment where

1

bigotry is normalized. Any who dare speak up and complain about unfair treatment are ostracized and/or retaliated against.

3.      Mr. Aziz began his employment with Chanel in June 2019 at the Neiman Marcus Tysons Corner location in McLean, Virginia. Mr. Aziz excelled in his role, enjoyed his job at Chanel, and worked well overall with his colleagues.

4.      However, Mr. Aziz faced issues with his Direct Managers, Anna Bauer and Bokdong Lee. For example, the very first week that Mr. Aziz began working for Chanel, Ms. Lee falsely and baselessly accused Mr. Aziz of stealing a case of Perrier water bottles instead of restocking them. When Mr. Aziz disputed this in a meeting with Ms. Lee and Ms. Bauer, Ms. Lee denied ever accusing him. The meeting ended with no resolution. This false accusation that occurred at the beginning of Mr. Aziz's tenure with Chanel set the tone for how he was to be treated by management.

5.      Furthermore, Ms. Bauer and Ms. Lee would call associates and manually cut time off their timesheets so that the managers did not look bad. They attempted to do this with Mr. Aziz, but he refused and complained to Chanel's corporate Human Resources department. One evening in 2020, Ms. Bauer forced Mr. Aziz to charge a V.I.C.'s credit card without their permission. Mr. Aziz felt like he had no choice but to comply as he feared he would be retaliated against.

6.      Mr. Aziz ultimately took time off work to deal with his mental health from July 20 through July 26, 2020.

7.      On August 14, 2020, Mr. Aziz emailed Ms. Courtney Beard as well as Mr. Matthew Korn from Human Resources to notify them of an incident in which Ms. Bauer angrily made false accusations against him. Specifically, Ms. Bauer, without support or proof, tried to have Mr. Aziz written up for "disclosing confidential company information;" something that simply never

happened. Ms. Bauer also made sly comments about Mr. Aziz taking breaks at work, which is well within his rights. Ms. Bauer's allegations were clearly retaliation for Mr. Aziz's previous complaints to HR about her.

8.      After a Human Resources investigation concluded that Mr. Aziz's allegations against management were, shockingly, unsubstantiated, he had no choice but to transfer to Chanel's flagship location in New York City in June of 2021.

9.      Shortly after Mr. Aziz transferred to the New York flagship location, Mr. Arman Anderson began making consistent sexually explicit and derogatory comments directed at Mr. Aziz. As a queer man, Mr. Aziz felt stereotyped, embarrassed, disgusted, and angry every time he was subjected to these comments and conversations. Mr. Anderson was a seasoned employee with over 15 years of experience at Chanel, despite having a well-known reputation of inappropriate and offensive behavior. Notably, Mr. Anderson was referred to as a "walking HR violation." Some examples of the sexual remarks Mr. Aziz was subjected to include:

a)  Mr. Anderson would incessantly comment on employees' and customers' bodies, voice his desire to "suck [a person] off," how he would "fuck his way through vacations," and would talk often about his sex life.

b)  Mr. Anderson commented on Mr. Aziz's body and weight: on one occasion telling him, "Oh, I see your ass" and on another, "keep losing weight and you'll be cute . . . you're not there yet."

c)  Around October 2021, Mr. Anderson generalized that "all gay men are sluts" in the back office in front of a group of coworkers.

d)  Around December 2021, during a conversation about gardening, Mr. Jack Spennato suddenly told Mr. Aziz, "I bet you'd like a zucchini up your ass."

e)  In May 2022, Mr. Anderson again started talking about his sex life and tried to include Mr. Aziz in his conversation by commenting that "he knew that [Mr. Aziz] had probably fucked a guy in a locker room before" and asking Mr. Aziz if he "liked fucking in saunas."

f)  In July 2022, Mr. Anderson asked, "You're Italian and Afghan. I bet you have a big dick, don't you?"

g)  In August 2022, Mr. Anderson told Mr. Aziz, "I know you like being bent over."

h)  In January 2023, Mr. Anderson walked up to Mr. Aziz and shoved his phone displaying gay pornography in Mr. Aziz's face and asked whether Mr. Aziz "found it hot."

10.    The Boutique Facilitator and all of Mr. Aziz's coworkers were aware of Mr. Anderson's penchant for harassment and inappropriate behavior but did nothing to prevent it. Mr. Aziz hoped that management would eventually do something about Mr. Anderson's conduct, but as time went on, he noticed that nothing was being done and that his behavior was excused.

11.    Mr. Aziz faced not only sexually harassing comments, but also was subjected to racially offensive comments regarding his Middle Eastern heritage from Mr. Spennato, a Fashion Advisor at Chanel. For example, Mr. Spenatto said the following:

a)  In September 2022, he asked Mr. Aziz, "since you're Afghan, is your family in the Taliban?"

b)  In December 2022, Mr. Spennato commented again on Mr. Aziz's Middle Eastern background, asking "did you take down the first or second tower?"

12.    Again, despite being present during several of these offensive remarks, Ms. Marissa Kos, the former Boutique Facilitator, took no action to rectify the discrimination and harassment.

In fact, when Mr. Aziz reported the unlawful conduct on multiple occasions to Ms. Kos, she dismissed his complaints.

13.     Mr. Aziz constantly strived for growth in his position but was unable to do so due to management's failures to correct improper procedures and address the hostile behavior towards him. Rather than alleviating issues, managers, including Ms. Kos, started taking steps to exclude Mr. Aziz and interfere with his work in retaliation for his complaints. Mr. Aziz noticed a disturbing pattern in which he was left out of communications, isolated from the team he was supposed to be working with, deprived of promotions, given falsified and damaging reviews, and excluded from meetings.

14.     Mr. Aziz was conveniently denied promotions after he made complaints about the hostile work environment. Despite being qualified, Mr. Aziz was denied the opportunity for 4 or 5 promotions that he applied for.

15.     Due to Chanel's continued failure to address the unlawful conduct creating intolerable conditions for Mr. Aziz, he escalated his concerns about the hostile and retaliatory workplace to Mr. Olivier Barre, Boutique Director, on November 8, 2022. Chanel dismissed Mr. Aziz's complaints, later distorted his words in an email, and rejected his attempts to correct the inaccurate information.

16.     Again, Mr. Aziz complained of the hostile and retaliatory workplace on November 16, 2022, and December 16, 2022, to Ms. Sandra Levkovich, Specialist, People & Organization, and the sexual harassment and racism on January 26, 2022. Chanel continuously failed to take any action to rectify the unlawful workplace and Mr. Aziz consistently suffered.

17.     On January 26, 2023, when Mr. Aziz again met with Ms. Levkovich to address his concerns, she stated Mr. Aziz's claims had been substantiated, but Chanel shockingly concluded

no company policy was violated. Mr. Aziz expressed his disbelief and complained that the harassing behavior extended to the point in which co-workers would make sexually inappropriate and racially harassing comments toward him.

18.     The next day, Ms. Levkovich provided a summary of Chanel's findings conveniently omitting any mention of sexual harassment and racial discrimination and concluding that no further action would be taken on Mr. Aziz's complaints.

19.     Due to Chanel's continued failures to address and remedy the unlawful and intolerable working conditions, Mr. Aziz was forced to resign on January 28, 2023.

20.     Chanel's website states it "care[s] deeply about [its] employees and strive[s] to create a safe environment that values people's humanity and uniqueness so that they are free to bring their full selves to their work and to their life's calling." However, this case demonstrates the opposite. Chanel's failures to act are clear – it does not "care deeply" about its employees nor does it ensure a safe work environment. On the contrary, Chanel promotes a discriminatory and retaliatory environment creating intolerable conditions, as it did to Mr. Aziz, in violation of federal and New York law.

21.     Mr. Aziz brings this case to obtain vindication for Chanel's flagrant violations of his rights under Title VII of the Civil Rights Act, 42 U.S.C. §§ 2000e *et seq.* ("Title VII") and the New York City Human Rights Law, Admin. Code §§ 8-107, *et seq*. ("NYCHRL").

## JURISDICTION AND VENUE

22.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 as this case is brought under the Federal Civil Rights Act of 1964. The Court has supplemental jurisdiction over Plaintiff's city law claim as this claim is so related to the other claims in this action that they form part of the same case or controversy under Article III of the United States Constitution.

23.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(1) and (2) because Defendant resides in New York, New York and a substantial part of the events or omissions giving rise to the claims herein occurred in this district.

## ADMINISTRATIVE REQUIREMENTS

24.     All conditions precedent to filing claims under Title VII have been performed or have occurred. On July 3, 2023, Plaintiff dually filed a Charge of Discrimination with the New York State Division of Human Rights ("SDHR") and Equal Employment Opportunity Commission ("EEOC") in connection with his claims of racial discrimination, sexual harassment, and retaliation as alleged herein pursuant to Title VII of the Civil Rights Act of 1964, as codified, 42 U.S.C. §§ 2000e to 2000e-17 ("Title VII").

25.     On July 12, 2023, Plaintiff, through his lawyers, submitted a request to dismiss the pending complaint with SDHR for administrative convenience. On August 2, 2023, the Division issued Mr. Aziz a Determination and Order of Dismissal for Administrative Convenience. On August 9, 2023, Plaintiff, through counsel, submitted a request to the EEOC to adopt the SDHR findings and issue a Notice of Right to Sue.

26.     On September 25, 2023, Plaintiff received the Notice of Right to Sue from the EEOC. Plaintiff has fully exhausted his administrative remedies and is entitled to file in the district court.

27.     Further, simultaneously with the filing of this Complaint, Plaintiff will serve a copy of this Complaint on the New York City Law Department, New York State Attorney General, and the New York City Human Rights Commission to fulfill any and all administrative prerequisites with respect to his NYCHRL claims alleged herein.

## THE PARTIES

28.     Plaintiff Alec Aziz is an adult resident of New York County, New York, who was previously employed by Defendant Chanel, Inc.

29.     Defendant Chanel, Inc. is a corporation headquartered in London, England, and subject to New York Law.

30.     Defendant Chanel is one of the most renowned luxury fashion houses in the world. Chanel operates over 500 boutiques worldwide. Chanel, Inc. is a corporation organized under the laws of New York, with headquarters in London and a principal place of business in New York, New York.

31.     While not currently named as defendants herein, the Global Chief Executive Officer ("CEO") of Chanel, Inc., Leena Nair, and the President of Chanel's U.S. Region, Stephane Blanchard, may become named defendants based upon discovery yet to be adduced in this action concerning their involvement with respect to Plaintiff's claims. It stands to reason that Leena Nair and Stephane Blanchard play a direct role in the management of Chanel, Inc. On information and belief, all significant personnel-related investigations at Chanel are vetted by them, and no decisions, including whether to protect senior Chanel talent, retaliate against victims or opponents of racial and sexual orientation-based harassment, or encourage, condone, and or abet harassment by senior Chanel executives, can be made without their approval. In this context, Ms. Nair, along with Mr. Blanchard, likely bear ultimate corporate responsibility for the negligent supervision and retention of personalities with a known propensity to create a hostile working environment for workers of color and queer workers at Chanel.

**STATEMENT OF FACTS**

**I. There is a Culture of Racism and Sexual Harassment Entrenched at Chanel That Has Led to Discrimination and the Silencing of Marginalized Employees**

32.     The information set forth in this section is alleged upon information and belief and based on reports from reputable news agencies and recently filed lawsuits against Chanel.

33.     Chanel has a well-documented and notorious reputation for racism, religious discrimination, age discrimination, homophobia, xenophobia, and tolerance of sexual harassment. Chanel executives and creative partners deride marginalized people and foster a toxic work environment where bigotry is normalized. Any who dare speak up and complain about unfair treatment are ignored and/or retaliated against. Here are some examples of allegations against Chanel and public incidents of discrimination:

34.     **2016**: A former Chanel Sales Associate in Texas sued the company for age discrimination and wrongful termination after Chanel unlawfully terminated her at the age of 59 and replaced her with a younger worker for a much lower salary.

35.     **2017**: Karl Lagerfeld, the former creative director and the face of Chanel, was known for making controversial public statements. After German Chancellor Angela Merkel opened the country's borders to migrants during the Syrian refugee crisis, Mr. Lagerfeld said in an interview with a French talk show, "One cannot – even if there are decades between them – kill millions of Jews so you can bring millions of their worst enemies in their place."

36.     **2017**: A San Francisco Chanel retail store manager named Mia Komarevic filed a lawsuit against Chanel for retaliatory discrimination, harassment, and wrongful termination after she reported seeing a Chanel director leave the store one night wearing merchandise without paying for it. When Ms. Komarevic followed Chanel's policy in this situation by reporting the incident, she went from being a valued and recognized employee who had a track record of good performance to one who suffered harassment and religious discrimination. Ms. Komarevic is a

member of the Serbian Orthodox Church and alleged in her lawsuit that her managers attempted to force her to quit by intentionally preventing her from practicing her religion by changing her schedule to force her to work on Sundays. This impeded her ability to practice according to the rules of her religion and was clear retaliation for reporting a superior for wrongdoing.

37.   **2017**: A Chanel employee in Florida filed a lawsuit against the company after she was retaliated against after complaining about discrimination. She alleged, after she filed a discrimination complaint against a coworker, she was given negative performance reviews, wrongfully terminated, and not recommended for a position she was offered at Chanel in Dubai.

38.   **2017**: Academy Award-nominated actress Gabourey Sidibe faced racial profiling and discrimination while shopping at a Chanel store in Chicago. She wrote an essay for the *Lenny Letter* newsletter describing the incident. After she asked a saleswoman in the store to show her sunglasses, the woman directed her to a discount glasses store across the street. "I knew what she was doing," the actress wrote, "she had decided after a single look at me that I wasn't there to spend any money. Even though I was carrying a Chanel bag, she decided I wasn't a Chanel customer and so, not worth her time and energy." Chanel apologized for this incident.

39.   **2018**: In an infamous interview with *Numero*, Karl Lagerfeld spoke about #metoo and sexual assault/harassment in the fashion industry. During one part of the interview, Mr. Lagerfeld referred to male models as "toxic" and "sordid creatures" and said he would prefer not to be left alone with them in light of recent sexual assault allegations made against high-profile figures in the industry. He also defended a stylist who was accused of pulling down the underwear of models without their consent. Mr. Lagerfeld said, "If you don't want your pants pulled about, don't become a model!"

40.   **2021**: In 2021, during a period of rampant hate crimes targeting the Asian

10

community, Michel Gaubert, a French DJ and longtime music collaborator for Chanel, posted a

video online of guests at a private dinner wearing offensive masks with slanty-eyes and chanting,

"Wuhan girls." Bruno Pavlovsky, the President of Fashion at Chanel, said that while Chanel does

not tolerate any form of racism, the brand would continue to work with Mr. Gaubert.

41.     **2022**: Miguel Bautista, a former Chanel employee, filed a lawsuit against Chanel

alleging violation of the discrimination and anti-retaliation provisions of Title VII and NYCHRL.

Mr. Bautista claimed that he was wrongfully disciplined and terminated after he filed complaints

against his supervisor for racial and national origin discrimination.

42.     **2022**: Five employees of Chanel in Korea sued a Chanel Korea executive for sexual

assault. Despite Chanel Korea's claim that it transferred the executive to another team to keep him

away from the victims, the company's labor union reported that the executive in question

continued to work regularly with the employees who reported him for assault.

43.     The foregoing clearly establishes a widespread pattern and practice at Chanel of

supporting its executives, managers, and artists who display discriminatory behavior. Thus, it is

no wonder, against this backdrop, that Mr. Aziz's harassers felt emboldened to mistreat him with

impunity.

**II. Mr. Aziz is Hired by Chanel in Virginia and Faces Issues with Management**

44.     Mr. Aziz began his employment with Chanel in June 2019 at the Neiman Marcus

Tysons Corner location in McLean, Virginia. Mr. Aziz excelled in his role, enjoyed his job at

Chanel, and worked well overall with his colleagues.

45.     However, Mr. Aziz faced issues with his Direct Managers, Anna Bauer, and

Bokdong Lee. For example, Ms. Bauer and Ms. Lee would call associates and manually cut time

off their timesheets so that the managers did not look bad. They attempted to do this with Mr. Aziz,

but he refused and complained to Chanel's corporate Human Resources department.

46.    Furthermore, during Mr. Aziz's interview, Ms. Bauer promised him that he would be scheduled for only one late shift per week and one weekend per month. This promise was a considerable factor in Mr. Aziz's decision to leave a position in sales he was exceeding at and work for Chanel. However, Ms. Bauer reneged on her promise and accused Mr. Aziz of "not [being] a team player" when he tried to discuss the issue with her. At the same time, a facilitator at a neighboring Chanel boutique and a Fashion Advisor who was a close friend of Ms. Bauer's were provided the schedule that was promised to Mr. Aziz.

47.    One evening in 2020, Ms. Bauer forced Mr. Aziz to charge a V.I.C.'s credit card without their permission. Mr. Aziz felt like he had no choice but to comply as he feared he would be retaliated against.

48.    On another occasion in 2020, Mr. Aziz was informed by his colleagues that Ms. Bauer belittled the store's only Black colleague during a conversation about current events, including the ongoing BLM protests. Ms. Bauer reportedly told the entire team except for Mr. Aziz and another employee that Mr. Aziz and his colleague defending the right to protest police violence were "young and haven't lived through as much as the rest of them," which Mr. Aziz found to be ignorant and inappropriate.

49.    Moreover, the very first week that Mr. Aziz began working for Chanel, Ms. Lee falsely accused Mr. Aziz of stealing a case of Perrier water bottles instead of restocking them. When Mr. Aziz disputed this in a meeting with Ms. Lee and Ms. Bauer, Ms. Lee denied ever accusing him. The meeting ended with no resolution. This false accusation that occurred at the beginning of Mr. Aziz's tenure with Chanel set the tone for how he was to be treated by management, and Mr. Aziz's relationship continued to worsen with both of his Direct Managers

at this location.

50.     On June 5, 2020, Mr. Aziz emailed Stephen Corbin, the Group Director, People &
Organization at Chanel to inform corporate of his issues with management. He wrote, "Over the
past year Anna has consistently been disrespectful, deceitful, and only concerned for herself
instead of her employees." He also wrote, "While working with Bokdong hasn't been AS
troubling, I have had to constantly overextend myself and my work to compensate for her being
unable to properly execute her duties and responsibilities as Operations Manager." He informed
Mr. Corbin about the incidents described above.

51.     On June 23, 2020, Mr. Aziz contacted Ms. Courtney Beard from Human Resources
to complain again about Ms. Bauer's behavior. Additionally, Mr. Aziz disclosed that there was a
new "Ready to Wear F.A." position added to their location and he would be able to take this role
on and was told that he was approved for the position. However, the position was ultimately
reconsidered, and Ms. Bauer did not keep Mr. Aziz updated on it.

52.     On July 8, 2020, Mr. Aziz emailed Mr. Matthew Korn, who was Lead, People &
Organization to inform him that, "with things being bad at home and at work, [his] mental health
has reached a very low point." He also notified Mr. Korn that he had been taking advantage of the
Employee Assistance Program to assist him with his mental health.

53.     Mr. Aziz ultimately took time off work to deal with his mental health from July 20
through July 26, 2020.

54.     On August 14, 2020, Mr. Aziz emailed Ms. Beard as well as Mr. Matthew Korn
from Human Resources to notify them of an incident in which Ms. Bauer angrily made false
accusations against him. Specifically, Ms. Bauer tried to have Mr. Aziz officially written up for
"disclosing confidential company information," which he denied. Ms. Bauer also made sly

comments about Mr. Aziz taking breaks at work, which is well within his rights. Ms. Bauer's allegations appeared to be in retaliation for Mr. Aziz's previous complaints to HR about her. In the email, Mr. Aziz expressed that Ms. Bauer's repeated spiteful actions "[were] taking a serious toll on [his] work environment and health."

55.     After a Human Resources investigation concluded that Mr. Aziz's allegations against management were unsubstantiated, he transferred to Chanel's flagship location in New York City in June of 2021.

### III. Mr. Aziz Experiences a Hostile Work Environment, Sexual Harassment, and Discrimination on the Basis of His Race

56.     Shortly after transferring to the New York location, Mr. Aziz was consistently subjected to explicit sexual comments and racial epithets.

57.     One of the perpetrators, Mr. Arman (or Erman) Anderson, was a seasoned employee with over 15 years with Chanel. Notably, Mr. Anderson was referred to as a "walking HR violation" on June 1, 2021, by the location's current Assistant Shoe Manager and former Boutique Facilitator, Ms. Marissa Kos. Mr. Anderson had a well-known reputation for being inappropriate and making patently offensive remarks. On a near-daily basis, Mr. Anderson would make sexual remarks. Some examples of the sexual remarks Mr. Aziz was subjected to include:

a) Mr. Anderson would incessantly comment on employees' and customers' bodies, voice his desire to "suck [a person] off," how he would "fuck his way through vacations," and would talk often about his sex life.

b) Mr. Anderson commented on Mr. Aziz's body and weight: on one occasion telling him, "Oh, I see your ass" and on another, "keep losing weight and you'll be cute . . . you're not there yet."

c) Around October 2021, Arman Anderson generalized that "all gay men are sluts"

in the back office in front of a group of coworkers.

d)  Around December 2021, during a conversation about gardening, Mr. Spennato suddenly told Mr. Aziz, "I bet you'd like a zucchini up your ass."

e)  In May 2022, Mr. Anderson again started talking about his sex life and tried to include Mr. Aziz in his conversation by commenting that "he knew that [Mr. Aziz] had probably fucked a guy in a locker room before" and asking Mr. Aziz if he "liked fucking in saunas."

f)  In July 2022, Mr. Anderson asked, "You're Italian and Afghan. I bet you have a big dick, don't you?"

g)  In August 2022, Mr. Anderson told Mr. Aziz, "I know you like being bent over."

h)  In January 2023, Mr. Anderson walked up to Mr. Aziz and shoved his phone displaying gay pornography in Mr. Aziz's face and asking whether Mr. Aziz "found it hot."

58.  As a queer man, Mr. Aziz felt stereotyped, embarrassed, disgusted, and angry every time he was subjected to these comments and conversations. Mr. Aziz made his attitude towards this behavior clear when possible – he would attempt to disengage by walking away or telling the speaker to stop.

59.  Ms. Kos and all of Mr. Aziz's coworkers were aware of Mr. Anderson's penchant for harassment and inappropriate behavior but did nothing to prevent it. Mr. Aziz hoped that management would eventually do something about Mr. Anderson's conduct, but as time went on, he noticed that nothing was being done and that his behavior was excused.

60.  Mr. Aziz faced not only sexually harassing comments, but also was subjected to racially offensive comments regarding his Middle Eastern heritage. In September 2022, Mr.

Spennato, Fashion Advisor, asked Mr. Aziz, "since you're Afghan, is your family in the Taliban?"

61.     In December 2022, Mr. Spennato commented again on Mr. Aziz's Middle Eastern background, asking "did you take down the first or second tower?" Mr. Aziz expressed his disbelief and attempted to de-escalate the situation by walking away.

**IV. Mr. Aziz was Retaliated Against for Reporting Mr. Anderson and Mr. Spennato for Harassment and Discrimination**

62.     Mr. Aziz constantly strived for growth in his position but was unable to do so due to management's failures to correct improper procedures and address the hostile behavior towards him. Rather than alleviating issues, managers, including Ms. Kos, started taking steps to exclude Mr. Aziz and interfere with his work in retaliation for complaining about the harassment he faced.

63.     Mr. Aziz noticed a disturbing pattern in which he was left out of communications, isolated from the team he was supposed to be working with, deprived of promotions, given falsified and damaging reviews, and excluded from meetings.

64.     In 2021, Mr. Aziz was provided the opportunity to work on a temporary "Stretch Assignment." This required collaboration with management and other teams. He was left out of communications about the assignment and was not provided with clear instructions on how to execute it. He was also not provided with adequate tools for the assignment. When Mr. Aziz attempted to communicate with his colleagues to gain clarity, he faced hostility.

65.     On a few occasions, Mr. Aziz's pre-approved schedule was changed at the last minute without explanation.

66.     Mr. Aziz was conveniently denied promotions after he made complaints about the hostile work environment. Despite being qualified, Mr. Aziz was denied the opportunity for 4 or 5 promotions that he applied for.

67.     Accordingly, as set forth above, Defendant has unlawfully subjected Mr. Aziz to a

toxic work environment that is hostile to queer and Middle Eastern individuals like him, and rife

with blatant and frequent acts of discrimination and retaliation. As a result, Mr. Aziz has been

significantly damaged – economically, emotionally, and reputationally – and is forced to bring the

instant action seeking redress from Defendant and to put an end to the discriminatory and hostile

work environment he and other Chanel employees have had to endure for far too long.

**V. Mr. Aziz Reports His Colleagues for Offensive Behavior and is Repeatedly Ignored**

68.     Despite being present during several of the offensive remarks described above, Ms.

Kos took no action to rectify the discrimination and harassment. In fact, when Mr. Aziz stated to

Ms. Kos on multiple occasions of the unlawful conduct, she dismissed his complaints stating, "you

know how they can be."

69.     Due to Chanel's continued failure to address the unlawful conduct creating

intolerable conditions for Mr. Aziz, he escalated his concerns about the hostile work environment,

as well as retaliatory actions taken against him, to Mr. Olivier Barre, Boutique Director, on

November 4, 2022.

70.     Mr. Aziz requested an in-person meeting with Mr. Barre. During the meeting, Mr.

Barre appeared to be uninterested and did not take Mr. Aziz's accusations seriously. For instance,

he constantly checked his watch during the meeting and flippantly and condescendingly asked Mr.

Aziz, "Um so, what are your issues with Marissa?" even after Mr. Aziz provided specific details

for upwards of ten minutes. When Mr. Aziz spoke about incidents of hostility by associates at the

store, Mr. Barre's uncaring response indicated that he would be unperturbed by Mr. Aziz's

accusations regarding Mr. Anderson and Mr. Spennato. Mr. Aziz was therefore hesitant to report

their offensive conduct to Mr. Barre.

71.     Subsequently, Mr. Barre distorted Mr. Aziz's words in an email summarizing the

meeting and rejected his attempts to correct the inaccurate information.

72.     Again, Mr. Aziz complained of the hostile and retaliatory workplace on November 16, 2022, and December 16, 2022, to Ms. Sandra Levkovich, Specialist, People & Organization. Nothing was done to rectify the situation.

73.     On January 26, 2023, when Mr. Aziz again met with Ms. Levkovich to address his concerns, she stated Mr. Aziz's claims had been substantiated, but Chanel shockingly concluded no company policy was violated. Mr. Aziz expressed his disbelief and complained that the harassing behavior extended to the point in which co-workers would make sexually inappropriate and racially harassing comments toward him.

74.     The next day, Ms. Levkovich provided a summary of Chanel's findings conveniently omitting any mention of sexual harassment and racial discrimination and concluding that no further action would be taken on Mr. Aziz's complaints.

75.     Due to Chanel's continued failures to address and remedy the unlawful and intolerable working conditions, Mr. Aziz was forced to resign on January 28, 2023.

76.     Chanel's website states it "care[s] deeply about [its] employees and strive[s] to create a safe environment that values people's humanity and uniqueness so that they are free to bring their full selves to their work and to their life's calling." However, this case demonstrates the opposite. Chanel's failures to act are clear – it does not "care deeply" about its employees nor does it ensure a safe work environment. On the contrary, Chanel promotes a discriminatory and retaliatory environment creating intolerable conditions, as it did to Mr. Aziz, in violation of federal and New York law.


**FIRST CAUSE OF ACTION**
**Disparate Treatment in Violation of Title VII of the Federal 1964 Civil Rights Act, 42**

**U.S.C. § 2000e *et seq*.**

77.     Plaintiff repeats and realleges the allegations contained in the foregoing paragraphs as if fully and completely stated herein.

78.     Title VII provides that it is an unlawful employment practice for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1).

79.     By the actions described above, among others, Defendant participated in the unlawful racial, sex, and national origin discrimination to which Plaintiff was subjected in violation of Title VII.

80.     Employment discrimination claims brought under Title VII are analyzed pursuant to the burden-shifting framework established by the Supreme Court in *McDonnell Douglas v. Green,* 411 U.S. 792 (1973). *Spires v. MetLife Grp., Inc*., No. 18-CV-4464 (RA), 2019 WL 4464393, at *4 (S.D.N.Y. Sept. 18, 2019).

81.     Under the *McDonnell Douglas* framework, to make a prima facie showing of disparate treatment under Title VII, a plaintiff must assert four necessary elements: "(1) that he is a member of a protected class; (2) that he was qualified for employment in the position; (3) that he suffered an adverse employment action; and, in addition, has (4) some minimal evidence suggesting an inference that the employer acted with discriminatory motivation." *Littlejohn v. City of New York*, 795 F.3d 297, 307 (2d Cir. 2015).

82.     Title VII prohibits adverse action against an employee because of sexual orientation. "Because of sex" includes LGBTQ+ protections. *Bostock v. Clayton Cty*., 140 S. Ct.

1731, 1734 (2020).

83.     Plaintiff is Afghani, Middle Eastern/Arab, and queer, and thus protected under Title VII.

84.     Plaintiff was eminently qualified to work at Chanel and he effectively performed his job responsibilities to a high standard. He worked at Chanel for nearly four years and was a dedicated employee who consistently went above and beyond. This is supported by praise from his colleagues, and Chanel's decision to transfer him to its flagship location in New York City, one of its most reputable locations worldwide.

85.     A constructive discharge is "functionally the same as an actual termination" and therefore is considered an adverse employment action. *Pa. State Police v. Suders*, 542 U.S. 129, 148 (2004).

86.     Mr. Anderson and Mr. Spennato made offensive, stereotypical, and invidious comments about Middle Eastern/Arab, Afghani, and queer people. Defendant knew about the discrimination and harassment Plaintiff experienced but failed to take appropriate action to correct it. These circumstances give rise to an inference of racial, national origin, and sexual orientation discrimination.

87.     But for Plaintiff's race, national origin, and sexual orientation he would not have been subjected to a hostile work environment, denied promotion opportunities, and ultimately constructively discharged.

88.     For all the foregoing reasons, Defendant has engaged in the unlawful employment practice of subjecting Mr. Aziz to disparate treatment in violation of Title VII.

89.     As a direct and proximate result of the discriminatory and abusive conduct of Defendant, Plaintiff suffered adverse employment consequences by the conduct of its employees

and managers, including loss of wages, professional opportunities, and other valuable benefits and emoluments of employment, as well as severe mental, physical and emotional stress, pain and suffering, anxiety, stress, humiliation, loss of enjoyment of life, and damage to his reputation.

90.     Defendant's conduct was willful and motivated by malice and/or reckless indifference to Plaintiff's legal rights, entitling him to an award of punitive damages.

**SECOND CAUSE OF ACTION**
**Retaliation in Violation of Title VII of the Federal 1964 Civil Rights Act, 42 U.S.C. § 2000e**
***et seq.***

91.     Plaintiff repeats and realleges the allegations contained in the foregoing paragraphs as if fully and completely stated herein.

92.     Title VII stipulates that it is an unlawful employment practice for an employer to "discriminate against any of his employees…because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a).

93.     To demonstrate a prima facie case of retaliation, a plaintiff must establish: "(1) that he participated in an activity protected by Title VII, (2) that his participation was known to his employer, (3) that his employer thereafter subjected her to a materially adverse employment action, and (4) that there was a causal connection between the protected activity and the adverse employment action." *Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 552 (2d Cir. 2010). Plaintiff's burden of proof at the prima facie stage is "de minimis." *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010).

94.     Protected activity is a formal or informal complaint about employment practices or conditions that is motivated by a "good faith, reasonable belief that the underlying employment

practice was unlawful," even if the practices or conditions were not actually unlawful. *Treglia v. Town of Manlius*, 313 F.3d 713, 719 (2d Cir. 2002).

95.    Plaintiff participated in a "protected activity" by filing a number of complaints about the hostile work environment he experienced at Chanel on the basis of his race, national origin, and sexual orientation.

96.    Defendant was aware of Plaintiff's numerous complaints about his coworkers' conduct.

97.    A constructive discharge is "functionally the same as an actual termination" and therefore is considered an adverse employment action. *Pa. State Police v. Suders*, 542 U.S. 129, 148 (2004).

98.    Defendant retaliated against Plaintiff in violation of Title VII by failing to provide him an opportunity to apply for a promotion, subjecting him to a hostile work environment, deliberately leaving him out of communications, and providing him with inadequate tools and instructions to complete his work. Chanel's conduct eventually led to Plaintiff's constructive discharge.

99.    To adequately plead causation, Plaintiff must plausibly allege that the retaliation was a "but-for" cause of the employer's adverse action. Causation may be shown by direct evidence of retaliatory animus or inferred through temporal proximity to the protected activity.

100.    Mr. Aziz was conveniently denied promotions shortly after he made complaints about the hostile work environment. Despite being qualified, Mr. Aziz was denied the opportunity for 4 or 5 promotions that he applied for.

101.    On January 26, 2023, Mr. Aziz met with Ms. Levkovich to address his concerns and complained that the harassing behavior extended to the point in which co-workers would make

sexually inappropriate and racially harassing comments toward him. The next day, Ms. Levkovich provided a summary of Chanel's findings conveniently omitting any mention of sexual harassment and racial discrimination and concluding that no further action would be taken on Mr. Aziz's complaints.

102.    Due to Chanel's continued failures to address and remedy the unlawful and intolerable working conditions, Mr. Aziz was constructively discharged on January 28, 2023.

103.    But for Plaintiff's complaints about the hostile work environment, Plaintiff would not have been denied opportunities for promotion. Moreover, but for Chanel's apathy regarding his colleague's racially discriminatory comments, he would not have been forced to resign.

104.    As a direct and proximate result of the discriminatory and abusive conduct of Defendant, Plaintiff suffered adverse employment consequences by the conduct of its employees and managers, including loss of wages, professional opportunities, and other valuable benefits and emoluments of employment, as well as severe mental, physical and emotional stress, pain and suffering, anxiety, stress, humiliation, loss of enjoyment of life, and damage to his reputation.

105.    Defendant's conduct was willful and motivated by malice and/or reckless indifference to Plaintiff's legal rights, entitling him to an award of punitive damages.

**THIRD CAUSE OF ACTION**
**Hostile Work Environment in Violation of Title VII of the Federal Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq*.**

106.    Plaintiff repeats and realleges the allegations contained in the foregoing paragraphs as if fully and completely stated herein.

107.    Pursuant to Title VII, it is unlawful to subject a person to a hostile work environment on the basis of his or her race, sex, and national origin. See 42 U.S.C. § 2000e-2(a)(1).

108.    "To establish a hostile work environment . . . , a plaintiff must show that 'the

workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Littlejohn v. City of New York*, 795 F.3d 297, 320 (2d Cir. 2015) (quoting *Harris v. Forklift Sys., Inc*., 510 U.S. 17, 21 (1993)).

109.   To survive a motion to dismiss, a plaintiff must allege facts showing "he was faced with 'harassment . . . of such quality or quantity that a reasonable employee would find the conditions of his employment altered for the worse.'" *Patane v. Clark*, 508 F.3d 106, 113 (2d Cir. 2007).

110.   An isolated incident can constitute a hostile work environment if it is sufficiently severe*. Feingold v. New York*, 366 F.3d 138, 150 (2d. Cir. 2004).

111.   On multiple occasions, Mr. Spennato and Mr. Anderson made severely offensive comments about people of Plaintiff's race, national origin, and sexual orientation. Plaintiff found this conduct so abusive and hostile that he experienced issues with his mental health and felt unsafe at work.

112.   An employer is strictly liable if the harassment culminates in discharge of the employee. *Redd v. New York Div. of Parole*, 678 F.3d 166, 182 (2d Cir. 2012). A constructive discharge is "functionally the same as an actual termination." *Pa. State Police v. Suders*, 542 U.S. 129, 148 (2004).

113.   Defendant fostered a hostile work environment by subjecting Plaintiff to his colleagues' racism, condoning such behavior, and failing to take corrective actions regarding them for their hostility toward Middle Easterners/Arabs, queer people, and Afghani people.

114.   Defendant acted negligently in this case and did not take reasonable steps to remedy the offensive conduct. Chanel was aware of Mr. Spennato and Mr. Anderson's hostile and abusive

24

comments and repeatedly ignored Plaintiff's attempts to remedy the situation and create a civil

workplace environment where he felt safe.

115.    For all the foregoing reasons, Chanel has engaged in the unlawful employment

practice of subjecting Mr. Aziz to a hostile work environment in violation of Title VII.

116.    As a direct and proximate result of the discriminatory and abusive conduct of

Defendant, Plaintiff suffered adverse employment consequences by the conduct of its employees

and managers, including loss of wages, professional opportunities, and other valuable benefits and

emoluments of employment, as well as severe mental, physical and emotional stress, pain and

suffering, anxiety, stress, humiliation, loss of enjoyment of life, and damage to his reputation.

117.    Defendant's conduct was willful and motivated by malice and/or reckless

indifference to Plaintiff's legal rights, entitling him to an award of punitive damages.

**FOURTH CAUSE OF ACTION**
**Racial and National Origin Discrimination in Violation of New York City Human Rights**
**Law, N.Y. Administrative Code § 8-107**

118.    Plaintiff repeats and realleges the allegations contained in the foregoing paragraphs

as if fully and completely stated herein.

119.    The NYCHRL makes it unlawful for an employer to discriminate against an

employee in the terms, conditions, or privileges of employment based on race, color, and national

origin.

120.    NYC Administrative Code 8-107(1) provides that: It "shall be an unlawful

discriminatory practice: (a) For an employer or an employee or agent thereof, because of the actual

or perceived …race, color, national origin… of any person: (1) To represent that any employment

or position is not available when in fact it is available; (2) To refuse to hire or employ or to bar or

to discharge from employment such person; or (3) To discriminate against such person in

compensation or in terms, conditions or privileges of employment."

121.    To establish an employment discrimination, claim under NYCHRL, Plaintiff must first establish a prima facie case of discrimination by showing that: (1) he is a member of a protected class; (2) he is qualified for his position; (3) he suffered an adverse employment action; and (4) the circumstances give rise to an inference of discrimination. *Jennings v. City of New York*, 2023 U.S. Dist. LEXIS 35325, *29.

122.    To state a claim for discrimination under the NYCHRL, a plaintiff must only show differential treatment of any degree based on a discriminatory motive. The NYCHRL must be construed "broadly in favor of discrimination plaintiffs, to the extent that such a construction is reasonably possible" to include differential treatment of a much broader degree than required under the NYSHRL.

123.    Plaintiff is Middle Eastern/Arab and Afghani, and thus a member of a protected class under NYC Administrative Code 8-107(1).

124.    Plaintiff was eminently qualified to serve in his position and he effectively performed his job responsibilities to a high standard. He was a dedicated employee who consistently went above and beyond.

125.    An adverse employment action is a materially adverse change in the terms, privileges, duration, and conditions of employment and can include refusal to promote and discharge. A constructive discharge is "functionally the same as an actual termination" and therefore is considered an adverse employment action. *Pa. State Police v. Suders*, 542 U.S. 129, 148 (2004).

126.    Despite Mr. Aziz's talents, proven track record of success, and tenure with the company, he was passed over for multiple promotions.

127.    An inference of discrimination can arise from circumstances including, but not limited to, the employer's invidious comments about others in the employee's protected group or the sequence of events leading to the plaintiff's adverse employment action. *Jennings v. City of New York*, 2023 U.S. Dist. LEXIS 35325, *34.

128.    Mr. Aziz's coworkers had previously espoused racist rhetoric and demonstrated clear disrespect for Middle Eastern and Afghan individuals like Mr. Aziz.

129.    Moreover, Mr. Aziz was constructively discharged after Chanel failed to address and correct the illegal conduct of its employees.

130.    Under the NYCHRL, liability for a hostile work environment claim is proven where a plaintiff proves that he or she was treated less well than other employees because of the relevant characteristic.

131.    Plaintiff was treated poorly and was marginalized, humiliated, and discriminated against by Defendant because of his race, color, and national origin, as detailed supra.

132.    As a direct and proximate result of the discriminatory and abusive conduct of Defendant, Plaintiff suffered adverse employment consequences by the conduct of its employees and managers, including loss of wages, professional opportunities, and other valuable benefits and emoluments of employment, as well as severe mental, physical and emotional stress, pain and suffering, anxiety, stress, humiliation, loss of enjoyment of life, and damage to his reputation.

133.    Defendant's conduct was willful and motivated by malice and/or reckless indifference to Plaintiff's legal rights, entitling him to an award of punitive damages.

**FIFTH CAUSE OF ACTION**
**Sexual Orientation and Gender Discrimination in Violation of New York City Human**

Rights Law, N.Y. Administrative Code § 8-107

134.    Plaintiff repeats and realleges the allegations contained in the foregoing paragraphs as if fully and completely stated herein.

135.    The NYCHRL makes it unlawful for an employer to discriminate against an employee in the terms, conditions or privileges of employment based on gender, including sexual harassment.

136.    NYC Administrative Code 8-107(1) provides that: It "shall be an unlawful discriminatory practice: (a) For an employer or an employee or agent thereof, because of the actual or perceived …gender, sexual orientation… of any person: (1) To represent that any employment or position is not available when in fact it is available; (2) To refuse to hire or employ or to bar or to discharge from employment such person; or (3) To discriminate against such person in compensation or in terms, conditions or privileges of employment."

137.    To state a claim for discrimination under the NYCHRL, a plaintiff must only show differential treatment of any degree based on a discriminatory motive. The NYCHRL must be construed "broadly in favor of discrimination plaintiffs, to the extent that such a construction is reasonably possible" to include differential treatment of a much broader degree than required under the NYSHRL.

138.    To establish discrimination under NYCHRL, a plaintiff need only show that he was treated less favorably than other employees because of his protected trait. *Mihalik v. Credit Agricole Cheuvreux N. Am., Inc*., 715 F.3d 102, 110 (2d Cir. 2013). The NYCHRL does not require that the conduct be materially adverse or severe and pervasive. Id. at 114.

139.    Under the NYCHRL, a victim of sexual harassment need only demonstrate that he is treated "less well" than other employees because of his protected status.

140.    Plaintiff is a queer man, and thus a member of a protected class under NYC Administrative Code 8-107(1).

141.    Here, Mr. Aziz was subjected to differential treatment, as outlined above, on the basis of his gender and sexual orientation. Mr. Aziz was continuously subjected to offensive discriminatory comments because he is a queer, Middle Eastern, man.

142.    As a direct and proximate result of the discriminatory and abusive conduct of Defendant, Plaintiff suffered adverse employment consequences by the conduct of its employees and managers, including loss of wages, professional opportunities, and other valuable benefits and emoluments of employment, as well as severe mental, physical and emotional stress, pain and suffering, anxiety, stress, humiliation, loss of enjoyment of life, and damage to his reputation.

143.    Defendants' conduct was willful and motivated by malice and/or reckless indifference to Plaintiff's legal rights, entitling him to an award of punitive damages.

**SIXTH CAUSE OF ACTION**
**Retaliation in Violation of the New York City Human Rights Law, N.Y. Administrative Code § 8-107**

144.    Plaintiff repeats and re-alleges the allegations contained in all the preceding paragraphs of this Complaint as if set forth herein at length.

145.    New York City Administrative Code Section 8-107(7) provides that: it is "an unlawful discriminatory practice for any person engaged in any activity to which this chapter applies to retaliate or discriminate in any manner against any person because such person has (1) opposed any practice forbidden under this chapter; or (2) filed a complaint, testified or assisted in any proceeding under this chapter; or (3) commenced a civil action alleging the commission of an act which would be an unlawful discriminatory practice under this chapter; or (4) assisted the commission or the corporation counsel in an investigation commenced pursuant to this title; or (5)

requested a reasonable accommodation under this chapter."

146. To establish a prima facie case of retaliation under the NYCHRL a plaintiff must show: (1) he engaged in a protective activity; (2) his employer was aware that he participated in such activity; (3) his employer engaged in conduct that was reasonably likely to deter a person from engaging in that protected activity; and (4) a causal connection between the protected activity and the retaliatory conduct. *Sanderson-Burgess v. City of New York*, 173 A.D.3d 1233, 1235 (2019). "[A] plaintiff need not establish that the alleged retaliation 'resulted in an ultimate action with respect to employment…or in a materially adverse change in the terms and conditions of the employment' so long as 'the retaliatory or discriminatory act…was reasonably likely to deter a person from engaging in a protected activity.'" *Brightman v. Prison Health Serv., Inc.*, 108 A.D.3d 739, 970 (2013).

147. NYCHRL employs a broader standard of an "adverse employment action" than its federal and state counterparts.

148. Here, Mr. Aziz engaged in protected activity by complaining about the discrimination and harassment he was subjected to. Mr. Aziz also complained to Chanel about the retaliatory conduct of his team members following his complaints.

149. Chanel was well aware of the protected activity given Mr. Aziz complained to numerous individuals, including his managers and HR.

150. Chanel engaged in conduct reasonably likely to deter Plaintiff from complaining of further discriminatory conduct by failing to remedy his concerns, excluding him from communications and meetings, giving him an inaccurate, career damaging and demeaning performance review, and isolating him from the team he was supposed to be working with. Finally, Chanel further deterred Mr. Aziz by stating his claims of discrimination and retaliation were

substantiated, but allegedly not violations of company policy so Chanel would not take any action. Chanel deterred Mr. Aziz by failing to address and correct the illegal conduct and dismissing his complaints. As a result, Mr. Aziz was constructively discharged from his role.

151.    A causal connection exists because the retaliatory conduct occurred after Mr. Aziz complained of the offensive discriminatory and sexual remarks via two HR investigations in Virginia and New York. Thus, Mr. Aziz can successfully establish a prima facie case for retaliation under the NYCHRL.

152.    As a direct and proximate result of Defendant's unlawful conduct in violation of the NYCHRL, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm, for which he is entitled to an award of damages, in addition to reasonable attorneys' fees and expenses.

153.    Defendant's unlawful actions constitute malicious, willful, and wanton violations of the NYCHRL, for which Plaintiff is entitled to an award of punitive damages.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully demands judgment in his favor against Defendant as follows:

A.    Declaring that Defendant has engaged in, and enjoining Defendant from continuing to engage in, unlawful employment practices prohibited by federal and New York City Law;

B.    Awarding Plaintiff compensatory damages for all back and future loss of wages, lost income, benefits, retirement losses, stock benefits losses, pain, suffering, stress, humiliation, mental anguish, and emotional harm, as well as damage to his reputation, damage to career path, and loss of income stemming therefrom;

C.    Awarding Plaintiff liquidated damages;

D.    Awarding Plaintiff treble damages;

E.      Awarding Plaintiff punitive damages;

F.      Awarding Plaintiff attorneys' fees and expert/consultant fees;

G.      Awarding Plaintiff pre- and post-judgment interest;

H.      Awarding Plaintiff reimbursement for the negative tax consequences of a judgment;

I.      Awarding Plaintiff costs of suit and attorneys' fees; and

J.      Awarding Plaintiff such other relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury with respect to all issues properly triable by jury.

Dated: October 23, 2023
  New York, New York        Respectfully submitted,

              **THE OTTINGER FIRM, P.C.**

              79 Madison Avenue
              New York, New York 10016
              Telephone: (347) 492-1904
              robert@ottingerlaw.com

              *COUNSEL FOR PLAINTIFF ALEXANDER AZIZ*